IN THE UNITED STATES BANKRUPTCY
COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

In re:                                    )
                                          )
**Jeffrey D. Facklis**                    ) Case 11-00139
                                          ) Hon. Pamela S. Hollis
                                          ) Chapter 11
            Debtor and Debtor in Possession    )

## DEBTOR'S AMENDED DISCLOSURE STATEMENT

### 1.    Introduction

On January 4, 2011 (the "Petition Date"), Jeffrey D. Facklis, debtor and debtor-in-possession ("Jeff" or "Debtor"), commenced a voluntary case under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Illinois. This Disclosure Statement with respect to the Plan of Reorganization of the Debtor (the "Disclosure Statement") sets forth certain information regarding the Debtor's prepetition history, the need to seek Chapter 11 protection, and significant events that have occurred or are expected to occur during the Debtor's Chapter 11 case. This Disclosure Statement also describes the terms and provisions of the Plan (as defined below), including certain alternatives to the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

The Disclosure Statement is being provided to all of the Debtor's known creditors and other parties in interest pursuant to 11 U.S.C. §1125 in order to provide information deemed by the Debtor to be material and necessary to enable such creditors and parties in interest to make a reasonably informed decision in the exercise of their rights to vote on, and participate in, the Plan of Reorganization of the Debtor (the "Plan")'.  A copy of the Plan has been filed concurrently with this Disclosure Statement. Creditors and interest holders are urged to review all the Plans terms and provisions with their attorneys.

THIS DISCLOSURE STATEMENT CONTAINS CERTAIN (i) PROVISIONS OF THE PLAN, (ii) STATUTORY PROVISIONS, (iii) DOCUMENTS RELATING TO THE PLAN, (iv) EVENTS EXPECTED TO OCCUR IN THE CHAPTER 11 CASE AND (v) FINANCIAL INFORMATION. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BASED UPON FINANCIAL AND OTHER

INFORMATION DEVELOPED BY THE DEBTOR AND HIS FINANCIAL ADVISORS FROM: (I) INFORMATION MAINTAINED BY THE DEBTOR; (ii) INFORMATION OBTAINED FROM THIRD PARTIES; AND (iii) PLEADINGS AND DOCUMENTS FILED IN THIS CHAPTER 11 CASE.

NO REPRESENTATIONS CONCERNING THE DEBTOR IS AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. YOU SHOULD NOT RELY ON ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OF THE PLAN WHICH IS OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT OR AUTHORIZED BY THE BANKRUPTCY COURT IN ARRIVING AT YOUR DECISION, AND YOU SHOULD REPORT ANY SUCH ADDITIONAL REPRESENTATION OR INDUCEMENT TO COUNSEL FOR THE DEBTOR WHO SHALL FURNISH SUCH INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

A BALLOT ACCOMPANIES THIS DISCLOSURE STATEMENT FOR YOUR USE IN VOTING ON THE PLAN. IN ORDER TO BE CONFIRMED, THE PLAN MUST BE ACCEPTED BY A MAJORITY IN NUMBER AND TWO-THIRDS IN AMOUNT OF THOSE VOTING IN EACH CLASS IMPAIRED UNDER THE PLAN, EXCEPT TO THE EXTENT THAT THE PLAN MAY BE CONFIRMED NOTWITHSTANDING THE FAILURE TO OBTAIN SUCH ACCEPTANCE IN ACCORDANCE WITH SECTION 1129(b) OF THE BANKRUPTCY CODE. FOR A DETAILED DISCUSSION ON SOLICITATION AND VOTING, SEE ARTICLE XVI BELOW.

YOU ARE URGED TO REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE BALLOT WITH COUNSEL OF YOUR CHOICE. HOLDERS OF CLAIMS WHICH ARE IMPAIRED UNDER THE PLAN MAY VOTE TO ACCEPT OR REJECT THE PLAN BY COMPLETING AND RETURNING THEIR BALLOT.

NONE OF THE INFORMATION CONTAINED HERE HAS BEEN SUBJECT TO A CERTIFIED AUDIT. BECAUSE OF THE COMPLEXITY OF HIS FINANCIAL AFFAIRS, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HERE IS WITHOUT ANY INACCURACY. ALTHOUGH THE DEBTOR BELIEVES THAT DUE CARE HAS BEEN TAKEN IN DEVELOPING FINANCIAL PROJECTIONS, BECAUSE THE PROJECTIONS SEEKS TO PORTRAY THE RESULTS OF FUTURE EVENTS, NOT ALL OF WHICH ARE WITHIN THE DEBTOR'S DIRECT CONTROL, VARIANCES MAY WELL OCCUR AND THEY MAY BE MATERIALLY ADVERSE COMPARED WITH THE PROJECTIONS.

THE DEBTOR RECOMMENDS AND REQUESTS YOUR ACCEPTANCE OF THE PLAN.

a.    **Purpose of Plan**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize his obligations to creditors in accordance with the provisions of the Bankruptcy Code.  The consummation of a plan of reorganization is the principal objective of a Chapter 11 case.  A plan of reorganization sets forth the means for satisfying claims against the debtor.

Confirmation of a plan of reorganization by the Bankruptcy Court makes the plan binding upon the debtor, any person or entity acquiring property under the plan, and any creditor of the debtor, whether or not the such creditor: (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

Subject to certain limited exceptions and other than as provided in the Plan itself or the confirmation order (the "Confirmation Order"), the Confirmation Order discharges the Debtor from any debt that arose prior to the Effective Date of the Plan, and substitutes for that debt the obligations specified under the confirmed Plan.  The terms of the Plan are based upon, among other things, the Debtor's assessment of his ability to achieve his goals, make distributions contemplated under the Plan and pay certain continuing obligations. Under the Plan, claims against the Debtor are divided into Classes according to their relative seniority and other criteria.

b. **Debtor information**

Jeff is an individual residing in Chicago, Illinois.  He is married to Julia Facklis, who is not a part of this case.

Jeff currently works as an Executive Vice President of Ops 3 LLC ("Ops 3"), an Illinois Limited Liability company wholly owned by FBP Holding LLC.  Jeff owns a 23% interest in FBP Holding.  Jeff also owns a 50% interest in 2201 W. Fulton, L.L.C. ("Fulton"), which owns the building in which Ops 3 LLC operates its business.  The building is designed specifically for the business operations.  Fulton's asset is subject to a mortgage held by American Chartered Bank and a security interest by the Community Economic Development Commission.

Jeff's sole source of income is from his employment with Ops 3.  Ops 3 is the entity which obtained the assets and allowed claims of 3 other entities-- Show Department, Inc. ("SDI"), Resolution Digital Studios, LLC ("RDS") and Boreray, LLC ("Boreray")(collectively the "Corporate Entities"), following the confirmation of each of the Corporate Entities respective Chapter 11 plans (the "Corporate Plans"), on December 15, 2011, with effective dates of January 1, 2012.[1]  Prior to the confirmation of those Corporate Plans, Jeff owned a 50% interest in each company (via his

---

[1] The pending bankruptcy cases of SDI and RDS were filed on September 20, 2010 and the cases for Fulton and Boreray were filed on or about December 13, 2010.  All four cases are being jointly administered pursuant to previous orders entered by this Court, under SDI's bankruptcy case docket, 10-42055.  Fulton was reorganized and survived as an entity and continues to own the real estate.

revocable trust), with his brother Lee owning the other 50%.

c.    **Relevant background information and reason for the filing of this bankruptcy.**

Jeff filed this Chapter 11 bankruptcy case in January of 2011.  The filing was necessitated by actions of American Chartered Bank ("ACB"), Fulton and the Corporate Entities' lender.  The bankruptcy cases for Fulton and the Corporate Entities were contentious; ACB sought to shutdown and liquidate Fulton and the Corporate Entities. During the fall of 2010, ACB filed, without notice to Jeff or any other party, state court actions against Jeff and his brother Lee Facklis ("Lee") based on confession of judgment language in the personal guaranties each had signed in connection with business debt of Fulton and the Corporate Entities[2].  ACB obtained confession judgments against Jeff and Lee in the sum of $6,469,259.09 on an *ex parte* basis.[3]  ACB waited until the appeal period for those *ex parte* confession judgments passed, then issued citations to discover assets against each of Jeff and Lee seeking to collect personal assets from them to pay the loans of Fulton and the Corporate Entities.  Jeff's bankruptcy filing followed his discovery of this judgment and citation to discover assets, not only to protect his real estate, but to protect his interests in Fulton and the Corporate Entities and the employment these entities provided to him and over 70 other individuals.[4]

The business of the Corporate Entities, now called Ops 3 LLC, is the only employment Jeff has had since 1983 and his personal financial situation is based entirely on the financial situation of the business of the Corporate Entities.  In 2007, SDI and its affiliates, enjoyed a record year.  When the economy started to decline in 2008, the Corporate Entities responded by reducing its workforce and reducing other expenses over the course of the year and into 2009.  In October 2008, AIG held its infamous corporate event just a few weeks after receiving government bailout money. The resulting political backlash, combined with the declining economy, decimated the show and event industry, the Corporate Entities' core business.  Business and revenues declined sharply.  By year- end 2009, gross revenues fell almost 50%.

Before any of the bankruptcy petitions were filed, Jeff, like Lee, did what he could to reduce business and personal expense.  Encumbered "company" cars were sold.  Jeff kept only an unencumbered vehicle and has assumed responsibility for maintenance of that vehicle (previously provided by the company).  Jeff borrowed against his 401K and invested those funds in the Corporate Entities.  He obtained a line of credit secured by the family residence[5], and provided part of those funds to the

---

[2] Lee also filed for Chapter 11 bankruptcy at the same time Jeff filed his case and for the same reason. Both cases are pending before this Court.

[3] The business debt is being paid at 100% in the Corporate Plans; the judgment does not reflect the "adequate protection" payments made prior to confirmation of the Corporate Plans, nor the payments made since confirmation.

[4] Pre-recession, the Corporate Entities employed approximately 114 people.

[5] He resides with his wife at a residence in Wilmette, Illinois, titled to his wife's trust.  Prior to the recession, this residence was unencumbered.  His wife permitted the encumbrance.

business.  Jeff and Lee have gone back "on-the-road," working shows, sourcing material, working with existing clients and soliciting new ones in an effort to rebuild the profitability of the business.  Jeff personally is the "account rep" for a large volume of the show staging accounts of the business.

Business revenue for the Corporate Entities is still well below the peak.  Ops 3 has struggled to regain clients it lost as a result of the filing of the bankruptcy cases, and to regain its reputation in this "small-community" industry.  The latter has proven particularly difficult, at least in part because of service of documents on the creditors, largely members of this "community", by ACB that reflected negatively on the businesses. However, Ops 3 continues to operate the business.  Based on recent history, it does not seem likely that any excess funds will be available for distribution in the foreseeable future.[6]  For the Corporate Entities, debt exceeds the asset value and the shares in those businesses likely have no marketable value, particularly given Jeff's minority ownership status in closely-held FBP Holding.

In addition to his interest in the Corporate Entities and Fulton which he helped found, Jeff owns a home in Wisconsin, subject to a first mortgage in favor of Bank of America, and a second mortgage given as security for a business loan in favor of ACB.[7]  Jeff was and has remained current in his mortgage to Bank of America, the LOC on the family residence and consumer-debt payments.  Under Jeff's proposed Chapter 11 Plan, Jeff will retain his interests in the Corporate Entities and Fulton Allowed general unsecured claims, if any, will be paid in full.

d.    **Overview of Assets**

Prior to the effective date of the Corporate Entities' Plans, Jeff had a 50% interest in the Corporate Entities.  Following confirmation of the Corporate Entities reorganization plan, his interest is 23% in FBP Holding LLC which owns 100% of Ops 3 LLC.  He also had and still has 50% interest in Fulton, which owns the real estate in which Ops 3 operates.[8]  He also owns various other personal assets of marginal value (clothing, household goods, etc.), plus whatever cash on hand he may have. He does not personally own an automobile, but drives an unencumbered, company-owned vehicle (2005 Toyota Prius), for which he is responsible for fuel, maintenance, etc.  Most of those assets are exempt under Illinois law.  The asset liquidation value to the estate is discussed in more detail in the liquidation analysis attached as Exhibit 4.

---

[6] Any "excess" funds are necessarily allocated to administrative and other expenses related to the bankruptcy proceedings and those critical repairs, maintenance and replacement of the facilities and equipment essential to the operation of the business—a process which must be ongoing but which was nearly impossible during the pendency of the bankruptcy.  Corporate Entities' counsel is on a payment plan, as cash flow will not allow the fee to be paid all at once.

[7] ACB demanded that Lee and Jeff pledge the equity in this real estate to secure loan numbered 158912. Lee previously held an interest in the Cable real estate prior to the filing of this bankruptcy; that interest was conveyed to Jeff in October 2010.

[8] The debt owed is approximately the same as the market value of the real estate; the debt is significantly higher than the liquidation value of the real estate owned by 2201 W. Fulton, L.L.C.  See Exhibit 5

Prior to the filing of the Corporate Entities' bankruptcy petitions, all of Jeff's corporate interests (defined to include limited liability company interests) were held by the Jeffrey D. Facklis Revocable Declaration of Trust dated December 20, 2000 (the "Trust").[9]  The interest in 2201 W. Fulton, L.L.C. continues to be held by the Trust. The interest in FBP Holding LLC (referenced above) is in his personal name.   Items held by the Trust included (in addition to 2201 W. Fulton, L.L.C):

| Asset | Ownership by Trust of the asset | Disposition |
|---|---|---|
| 4800 E. Quarry Drive, Utah (condo) | Jeff--50% | sold in 2010, excess funds contributed to Show Department, Inc. (mortgage held by ACB) |
| Copper Road Production, LLC | Jeff-50% | No activity, no revenue; will be allowed to administratively dissolve (formed to participate in speculative projects, e.g. incomplete Gangs North documentary--asset of speculative value; any Gangs North interest is now held by Ops 3 LLC) |
| Dallia, Ltd. | Jeff--50% | Formed to act as manager to Copper Road Productions, LLC.  Will be allowed to administratively dissolve (no other 'asset'; no revenue) |
| 1466 E. 168TH ST LLC | Jeff--25% | 1466 E. 168th Street LLC owned a rental warehouse; interest sold to other (non-debtor) members in 2010 (ACB required the divestiture of the interest in order to refinance the mortgage debt) |
| term-life insurance policies | | as noted in schedule B, Personal Property, item 20 [Dkt 18] |

### e.   Retention of Debtor's Professionals

The Debtor has retained Andrew J. Maxwell and Maxwell Law Group, LLC to serve as counsel in this case.  By orders dated January 22, 2010, the Bankruptcy Court approved the retention of Debtor's counsel *nunc pro tunc* to the Petition Date.

### 2.   Summary of Treatment of Claims Pursuant to Local Rule 3016-1.

The Debtor's Plan of Reorganization (the "Plan") provides that on its Effective Date, the Debtor shall retain his assets, as provided below.

a.   In general, the Debtor will pay Administrative Claims and the claims in separate classes of claims (plus the Class for Equity Interests):

CLASS 1                    Administrative Claims

---

[9] See Schedule B, Personal Property, item 20 [Dkt 18].  The Trust was an estate planning tool; as a revocable trust, it uses Jeff's social security number and activity is reported on Jeff's income tax returns. It holds no money or money-equivalent.

CLASS 2            Secured Claims, real estate
CLASS 3            Unsecured Claims, consumer/personal
CLASS 4            Confession Judgment, Business Debt (Contingent)

**CLASS 1.     Administrative Claims estimated at $30,000**.  These claims will be paid on or within 2 years of the Effective Date of the Plan (monthly payments) or in accordance with agreements between the Debtor and each holder of an Administrative Claim.  United States Trustee's fees and other bankruptcy fees shall be paid in full on or before the Effective Date or as they come due after t he  Effective Date.   The source of payment for these amounts will be the Debtor's income.

**CLASS 2.     Secured Claims, Real Estate**:  Class 2 secured claims consists of Bank of America ("BOA").  As of November, 2012, Jeff owes $326,218 on the primary mortgage (#8799) on the Wisconsin real estate and $233,064 on the Line of Credit (#8783) on the family residence in Wilmette, Illinois.  Payments are current; there is no arrearage.  Jeff will continue to pay the mortgage and LOC on a current basis according to the loan contracts, and will assume the personal liability under the contract documents.

This Class is not impaired.

**CLASS 3.     General Unsecured Claims:** Two claims were filed in this case in the combined amount of 30,030.87.[10]  To the extent that money is owed and the claims are allowed, Jeff will pay the claims in full within two (2) years, either in a lump sum or by equal monthly payments, after the Administrative Claims have been paid in full.   These claims shall be paid without interest.

This Class is impaired.

**CLASS 4.     Judgment, Business Debt (Contingent).**  This class consists of the *ex parte* judgment acquired by ACB based upon confession of judgment provisions in the personal guaranties signed by Jeff in conjunction with loans made by ACB to the Corporate Entities.  Jeff (along with his brother Lee and the Reorganized Debtor Ops 3 LLC) have filed an adversary proceeding against ACB alleging that the Confession Judgment is void, that the second mortgage against the Wisconsin real estate is released and that all personal guaranties for the business debt have been abrogated (merged into the debt assumed by the Reorganized Debtor, Ops 3 LLC), and seeking injunctive and declaratory relief.  In addition, the business debt is being paid at 100% under the Business Debtors' Confirmed Plans of Reorganization; permitting payment under Jeff's Plan results in a double recovery for ACB.

---

[10] One of the claims filed is for a business credit card debt ($28,000); Jeff may object to all or part of this debt, as it is within the Corporate Entities confirmed Plans and due to his lack of agreement to guarantee this debt.

This class also includes any claim ACB may have under the mortgage filed against the Wisconsin property.  That mortgage was given solely as additional security for the ACB note numbered 158912.[11]  As a prepetition security instrument, this mortgage did not survive the confirmation of the Corporate Plans.  In addition, the debt secured by this mortgage is being paid at 100% under the Corporate Plans; permitting a 'recovery' here allows ACB a double recovery.  If Jeff is unsuccessful in the adversary proceeding or other objection to these claims, these claims will be paid from Jeff's disposable income, after the Administrative Claims and Class 3 Claims are paid, to the end of the Plan term.

**If Jeff is successful in his challenges to the double recovery ACB seeks under the judgment and the Wisconsin mortgage, Jeff will dismiss his Chapter 11 case.**

b.   **Total of Payments**.

The Class 2 secured creditors will be paid according to the contracts.  Class 2 creditors will retain their security and Jeff will remain personally obligated to pay the secured debt.  The total of the payments to secured creditors (Class 2) will be:

| Bank of America | Monthly | Current Principal Balance |
|---|---|---|
| Wisconsin | $6,228.16 | $326,218 |
| Wilmette (approx.) | $600.00 | $233,064 |

The Class 5 claims total approximately $30,000.00.  These claims, as allowed, will be paid within two (2) years, either in a lump sum or in installments.

Payments to Class 2 and 3 are projected to total about $589,282.00 ($30,000.00 general unsecured and the principal balance of the 1st BOA mortgage and Wilmette LOC).

(a) Debtor will pay the Administrative Claim via monthly payments, until paid.

(b) Allowed Claims will be paid monthly and paid immediately after the Administrative Claims are paid; however, based upon the amount of the Allowed Claims, Debtor may pay the Claims in a lump sum.

(b) The Debtor will make his first payment on the fifteenth day of the first full

---

[11]  A copy of the Mortgage is attached to ACB's claim in LEE's case [11-00136] as claim 11-2, pp 7-15. "Loan No.: 158912" is a header on each page, but the 1st.  On page 8 of the mortgage (page 14 of the Claim), Borrower is defined as:  **Borrower. The word "Borrower means Show Department. Inc.; Boreray, L.L.C.; and Resolution Digital Studios, L.L.C. and includes all co-signers and co-makers signing the Note and all their successors and assigns.** Other provisions make clear this is additional security for business debt.  The only promissory note for this debt is via Note No. 158912, from the Corporate Entities to ACB.

calendar month following the Effective Date.

(c) The payments on these Claims are identified in Exhibit 2.

Any uncashed checks or returned distributions shall be the property of the Debtor. The Debtor advises all creditors and other parties in interest that under § 1127(a) of the Bankruptcy Code, the Debtor may, within certain limits, modify the Plan at any time before confirmation. Further, negotiations between the Debtor and one or more of his creditors may result in such modifications. The Debtor does not expect nor intend to agree to modifications that would materially and adversely influence the feasibility of the Plan as now constituted. The Debtor will bring all such proposed modifications to the attention of the Bankruptcy Court by appropriate pleading before they become effective.

d.    **Where is the Money Coming from?**

Except as noted below, the Debtor will make all payments out of his future income as an employee of Ops 3.  The Debtor expects to receive net income sufficient to pay the Allowed Claims as stated above.  Creditors can review a recitation of historical results, a summary of reasonable and necessary living expenses and a detailed projection of the Debtor's income and expenses at Exhibits 1 and 3.  Jeff Facklis will continue to hold his membership interests in FBP Holding LLC and 2201 W. Fulton, LLC, will manage the business, building and relationships, and will contribute $1,000.00 to each of the entities in exchange for retention of the interest.

e.    **Designation of Claims**.

The Debtor expects that there will be no material change in the number or amount of Claims before the hearing on confirmation, with one exception.  Bank of America holds a mortgage on property in Wisconsin.  When the mortgage was made (2003), Jeff and Lee Facklis owned the property together.  In October of 2010, Lee quitclaimed his interest to Jeff.  Jeff has paid the mortgage since that date, is current in payments and anticipates paying the debt in his personal bankruptcy.  In the event the Cable real estate is liquidated and BOA obtains an unsecured deficiency balance, it shall be treated as an unsecured claim in accordance to Class 3. However, Debtor would then seek to amend the payment terms to allow for a longer period of time within which to pay the unsecured deficiency balance, in the unlikely event there is any.

A CLAIM WILL RECEIVE A DISTRIBUTION UNDER THE PLAN ONLY IF IT IS AN "ALLOWED CLAIM." "Allowed Claim" is a term defined in the Plan and shall mean any Claim against the Debtor, provided: (a) proof of which was timely and properly Filed or, if no proof of claim was Filed, which has been or hereafter is listed by the Debtor on its schedules as liquidated in amount and not disputed or contingent and (b) in either such case, a Claim as to which no objection to the allowance has been interposed on or before the date provided in Article V or such other applicable period of limitation fixed by the Bankruptcy Code, the Rules, or the Bankruptcy Court, or as to which any

objection has been determined by a Final Order to the extent such objection is determined in favor of a claimant.

**3.     Analysis of the Debtor's Income, Current Assets and Liabilities.**

Jeff bases his projections on historical income and a consideration of the fact that the OPS 3 is operating on a cash flow basis, and is still subject to a sluggish economy as well as the negative effects of the Corporate Entities' Chapter 11 filings.  Pre-recession and pre-bankruptcy filings, Jeff enjoyed distributions from his (then) companies.  However, given the current economic climate, it is impossible to predict if or when OPS 3 will realize sufficient income to pay distributions, particularly given the economic cost of the bankruptcies and OPS 3's need to reinvest in equipment, infrastructure, marketing, etc. Therefore, the repayment plan is based solely upon Debtor's salary.

The other liabilities, e.g. the ex parte confession judgment obtained by ACB, have been challenged on several grounds in adversary proceedings in the Corporate Entities Chapter 11 cases and Jeff's and Lee's cases on a variety of grounds.  In addition, those liabilities are already being paid at 100% in the Corporate Entities confirmed Plans.  No allowance is made for them in this Plan.

Creditors can review complete projections of the Debtor's income and expenses, which are attached as Exhibit 3.  Creditors can review a valuation of the Debtor's assets at Exhibit 4.

**4.     Classification of Claims and Interests**.

The Bankruptcy Code requires that a plan of reorganization place each classified creditor's claim in a class with other claims or Interests that are "substantially similar." The dollar amount of a claim is usually not a basis upon which to distinguish it from other claims.

As stated, the Plan establishes five classes of claims.  Each class will be considered a separate class for voting purposes. The Bankruptcy Court must independently conclude that the Plan's classification scheme is authorized, but any creditor who believes that the Plan has improperly classified any group of claims or Interests may object to confirmation of the Plan. The Debtor believes that the Plan's classification of claims fully complies with the requirements of the Bankruptcy Code and applicable case law.

General Terms - All claims submitted by creditors shall be fixed and determined in accordance with the proof of claim filed with the Clerk of the United States Bankruptcy Court.  Unless otherwise specifically provided in this Disclosure Statement following the Petition Date:

a.     No creditor shall accrue interest on its claim after the Petition Date;

b.      After the Petition Date, each creditor waives:

1.   default interest;

2.   penalties;

3.   the right to accelerate payment; and

4.   Contractual attorney's fees.

c.      Effect of Filing and Not Filing Claims - Each creditor who has filed a proof of claim is not bound by the Debtor's estimates of claims against it.  Any creditor, who did not file a proof of claim, is bound by the Debtor's calculation of the amount owed to that creditor.  If the Debtor disputed a debt on his schedules and the creditor in question did not file a proof of claim, the debt shall be deemed disallowed and will be discharged.

## 5.    Treatment of Equity Interests

**Equity Interests**.  The Debtor is the holder of an interest in FBP Holding LLC, which in turn owns Ops 3, the successor in interest to the Corporate Entities, as referenced previously.     Debtor is also a holder of an interest in Fulton.  Debtor does not believe these interests have any market value, based on the value of the property being nearly equal to the debt owed and being paid under those Plans.  In fact, if Jeff is not permitted to retain these interests, Jeff would have no incentive to continue working in the business, resulting in a severe diminution in any purported marketable value and probable cessation of business.[12]  Accordingly, a liquidation of these interests is not anticipated.

If the Class 4 claims are allowed, Jeff offers to pay $1,000.00 in new value for this minority interest in FBP Holding LLC and $1,000.00 for his 50% interest in 2201 W. Fulton, L.L.C. (assuming his Chapter 11 case is not dismissed).  This offer is based on the belief that there is no equity in the entities, although there is "value" in each as an on-going concern, at least so long as Lee and Jeff are able to continue their efforts in rebuilding these companies and maintaining their client relationships.  See Exhibit 5, regarding the current status of assets and debt.

The source of the new- value- funds is a non-debtor, and Jeff has no obligation to repay these funds.  However, ACB has objected to this retention and has stated it will vote against the Plan.  Under these circumstances, the law requires that Jeff's interests must be subjected to the market.

All Creditors and the general public will have an opportunity to bid for Jeff's 23%

---

[12] With the resultant loss of 70 jobs, plus the inability to pay the Ops 3 allowed claims as well as foreclose Jeff's ability  to pay any amount to the unsecured creditors in this case

interest in FBP Holding LLC and his 50% interest in 2201 W. Fulton, L.L.C., in accordance with the following procedures (as may be approved by the Bankruptcy Court not less than seven (7) days preceding the Confirmation Hearing (the "Bid Procedures"):  The interest in FBP Holding LLC will only be sold in one block and the interest in 2201 W. Fulton, L.L.C. will only be sold in one block.  Creditors will not be permitted to bid their Claims as part of the purchase price.  The Debtor will publish notice of the sale and the terms of the sale in a newspaper of general circulation at least fourteen (14) days prior to the hearing on confirmation of the Plan.

Those parties seeking to acquire Jeff's interest(s) will be required to serve written notice of their intention to bid on counsel to the Debtor and the U.S. Trustee (the 'Notice Parties), which notice shall contain the bidder's name, address, financial statements and tax returns for the last two years.  The terms of the bid and a verified statement that if the bid is accepted, the bidder will agree to abide by the terms of the sale as described above.  The written notice must be accompanied by an earnest money deposit in the amount of $5,000.00 in the form of cashier's or certified check and must be received by Debtor's counsel on or before the last day to file ballots accepting or rejecting the Plan. Upon request, receipt of the written notice, payment of the deposit and execution of a nondisclosure agreement, Debtor will supply the Operating Agreements for FBP Holding LLC and 2201 W. Fulton, L.L.C., along with internally-compiled financial statements for the year ended 2012.  The failure to provide written notice within the time provided will conclusively be deemed a waiver of the opportunity to purchase the interest(s).  In the event that there are competing bids for the interest(s), the Court will hold an auction at the Confirmation Hearing.  Competing bids will be offered at increments of $1,000.00.

Payment for the interests will be due on the fifteenth day after the Effective Date of the Plan.  In the event that the successful bidder fails to make the required payment, then the bid will be deemed withdrawn and the interest will be offered to the next highest bidder.  In this event, payment will be due within five (5) days.  The bids and the interest sold are subject to the terms of the Operating Agreements for FBP Holding LLC and 2201 W. Fulton, L.L.C.

As indicated elsewhere in this Disclosure Statement, and in the Disclosure Statement and Plans for the Business Debtors, Jeff Facklis believes that his involvement in and retention of the shares in FBP Holding LLC and 2201 W. Fulton, L.L.C. are critical to the success of the reorganization of the Business Debtors Plans of Reorganization, as well as to the success of his own Plan of Reorganization.  As such, rather than accede to this involuntary sale of his interests, Jeff will seek to obtain additional funds from a non-debtor sufficient to match or exceed bids received, in order to retain his interests.  Jeff must provide proof of these funds no later than the confirmation hearing.  Jeff is prohibited from repaying any such funds received, and those funds must be contributed to the estate for the use and benefit of the Claimants.

## 6.  Purpose of Disclosure Statement.

The Debtor provides this Disclosure Statement to all of his known creditors,

pursuant to § 1125 of the Bankruptcy Code to permit those interested parties to make an informed judgment in exercising their right to vote on the Debtor's Plan. The Debtor has filed a copy of the Debtor's Plan.

Chapter 11 of the Bankruptcy Code allows the Debtor to submit to his creditors and a copy of the Debtor's Plan or a summary of it and a written disclosure statement, which the Bankruptcy Court has approved after notice and hearing as containing adequate information, as defined in § 1125(a) of the Bankruptcy Code.

The Debtor has attempted to comply with the requirements of the law and your receipt of this statement means that the Bankruptcy Court has approved this statement as containing adequate information after having afforded interested parties an opportunity to suggest to the Bankruptcy Court that the Debtor should provide additional information.

The Debtor and his counsel have endeavored to make this Disclosure Statement as accurate as reasonably possible and to meet the requirements of the law as to disclosure.

## 7.   Confirmation of Plan.

The Bankruptcy Court has approved this Disclosure Statement in accordance with § 1125 of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Rules"). The Debtor is providing a copy of this Disclosure Statement to each creditor whose Claim has been scheduled by the Debtor or who has filed a proof of claim in the Debtor's case. The Debtor intends that this Disclosure Statement will assist creditors whose Claims are impaired in evaluating the Plan and in determining whether to accept or reject the Plan. Under the Bankruptcy Code, an interested party may not solicit acceptance of the Plan unless (a) that interested party furnishes a copy of a disclosure statement before or concurrently with solicitation or (b) the Bankruptcy Court has authorized the interested party to solicit votes.

You should understand that the Bankruptcy Court's approval of this Disclosure Statement in no way constitutes an endorsement of the Debtor's Plan by the Bankruptcy Court or a guarantee of the accuracy or completeness of the information.

A quick overview of the process for the confirmation of a reorganization plan may prove useful. For a bankruptcy court to approve a proposed reorganization plan, the plan's proponent must show that the plan satisfies the 13 requirements of § 1129(a) of the Bankruptcy Code, if they are applicable.  With one exception, a plan must meet all 13 requirements. They are:

1) the plan's compliance with Title 11,
2) the proponent's compliance with Title 11,
3) the good faith proposal of the plan,

4) the disclosure of payments,
5) the identification of management,
6) the regulatory approval of rate changes, if applicable,
7) the "best interest" test,
8) the unanimous acceptance by impaired classes,
9) the treatment of administrative and Priority Claims,
10) the acceptance by at least one impaired class of Claims,
11) the feasibility of the plan,
12) the bankruptcy fees, and
13) retiree benefits.

See § 1129(a)(1)-(13) of the Bankruptcy Code.  If, however, a plan is not approved by all of the impaired classes, as generally required by § 1129(a)(8) of the Bankruptcy Code, it is still possible for a plan to be confirmed.  If at least one of the non-insider, impaired classes of Claims approves the plan, then a plan may be confirmed if two additional requirements are met. See § 1129(b) of the Bankruptcy Code. If the Bankruptcy Court finds that all of the applicable requirements of § 1129(a) of the Bankruptcy Code are met except for § 1129(a)(8) of the Bankruptcy Code, and also that the plan does not discriminate unfairly between impaired classes and is fair and equitable to the rejecting classes, then the Bankruptcy Court may confirm the plan. See § 1129(b)(1)-(2) of the Bankruptcy Code.

## 8. Effect of Confirmation.

Upon the Effective Date, any debt that arose before the Petition Date, and any debt of a kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, shall be discharged, except as otherwise provided in the Plan. This discharge shall be effective regardless of whether or not a proof of claim is filed or deemed filed, a claim is an Allowed Claim or the holder of a claim has accepted the Plan.

The provisions of the Plan shall be binding upon the Debtor and any creditor or equity security holder, whether or not such creditor or equity security holder has accepted the Plan and regardless of whether the claims of such creditor or equity security holder are impaired under the Plan. Upon the Effective Date, all property of the estate shall vest in the Debtor. Except as otherwise provided in the Plan, all property dealt with by the Plan shall be free and clear of all claims and interests of creditors and equity security holders.

## 9.   Defined Terms.

Most words or phrases used in this Disclosure Statement have their usual and customary meanings.  Some words or phrases when used in the context of the Plan and Disclosure Statement with initial capital letters shall have the definitions set forth in the Plan.   Unless otherwise defined, the terms used in this Disclosure Statement shall have the same meaning as in the Bankruptcy Code or the Rules.

**10.     Persons Entitled to Vote on Plan.**

a.      The Bankruptcy Court in connection with confirmation of the Plan will only count the votes of classes of creditors whose Claims are allowed and who the Debtor seeks to impair under the Plan.  Generally, and subject to the specific provisions of §1124 of the Bankruptcy Code, this includes creditors who, under the Plan, will receive less than payment in full in cash of the allowed amounts of their respective Claims on the "Effective Date". The Plan defines "Effective Date" as "the first Business Day occurring after the date on which the Confirmation Order becomes a Final Order." The Debtor's Plan seeks to impair the claims of prepetition unsecured creditors and equity security holders.

b.      Any ballot which accompanies this Disclosure Statement does not constitute a proof of claim. If you are uncertain whether your claim has been correctly scheduled, you may examine the Debtor's schedules which are on file with, and may be inspected at, the office of the Clerk of the Bankruptcy Court, 219 S. Dearborn Street, Chicago, Illinois 60604.

c.      Acceptances Necessary to Confirm Plan.

The Bankruptcy Court at the confirmation hearing must determine, among other things, whether each class of creditors whose claims are impaired by the Plan has accepted the Plan. Under §1126 of the Bankruptcy Code, an impaired class is deemed to have accepted the Plan if creditors, other than any entity designated under § 1126(e), that holds (a) at least two-thirds in amount and (b) more than one-half in number of the Allowed Claims of the class have voted to accept the Plan. Further, unless there is unanimous acceptance of the Plan by an impaired class, the Bankruptcy Court must also determine whether under the Plan class members will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such class members would receive or retain, if a Chapter 7 trustee liquidated the Debtor's property under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan.

d.      Confirmation of the Plan without Necessary Acceptances.

The Bankruptcy Court may confirm the Plan, even if all of the impaired classes do not accept it, if the Bankruptcy Court finds that at least one impaired class accepted the Plan and finds that the Plan does not discriminate unfairly against, and is fair and equitable as to, all non-accepting impaired classes. The above referenced provision is set forth in the Bankruptcy Code at §1129(b) and requires that, among other things, the creditors in the impaired classes must either receive the full value of their claims or, if they receive less, no holder of any interest that is junior to the interests of such class will receive or retain under the Plan on account of such junior claim any property. In seeking confirmation of the Plan, the Debtor may rely on § 1129 of the Bankruptcy Code as to any non-accepting classes.

**11.    Sources of Information.**

In preparing this Disclosure Statement, counsel for the Debtor relied upon and utilized the following:

1.    Income and Expense Records;

2.    Financial records; and Estimation of the Debtor's future income and financial information; and

3.    Discussions with the Debtor.

**12.    Summary of Liquidation Analysis.**

The Debtor has limited or no non-exempt assets available for liquidation and sale for the benefit of unsecured creditors; other non-exempt assets were sold before the bankruptcy petition was filed.

If the Bankruptcy Court converted the Debtor's case to a case under Chapter 7 of the Bankruptcy Code, the Debtor projects that no gross proceeds from the liquidation of assets would be available for any claimant other than the holders of secured claims. There is no likelihood that any monies would be paid to Class 3 unsecured creditors in a liquidation case.

The Debtor believes the Plan is feasible.

**13.    Objection to Claims.**

The Debtor reserves the right to object to any claim after the Effective Date and have the Bankruptcy Court estimate the amount of any Allowed Claim

**14.    Litigation.**

The Debtor was a defendant in litigation filed by ACB against him to confess judgment based on language contained in the individual guaranties for the business debt owed by the Corporate Entities.   Although that debt is being paid pursuant to the Corporate Plans and those same Corporate Plans negate Jeff's obligations to ACB, ACB has not released the confession judgment.  That confession judgment is not included as a claim to be paid under the plan in this case and will be deemed discharged.

**15.    Modification.**

The Debtor expects that there will be no material change in the number or amount of these claims before the hearing on confirmation.  The Plan does not affect or impair any rights or obligations in which the Debtor's creditors and/or shareholders

may have interests, or the relative priority or subordination thereof.

## 16.    Unclaimed Distributions.

If any distribution is returned to the Debtor as undeliverable, no further distributions shall be made to such holder unless and until the Debtor is notified in writing of such holder's then-current address. Checks issued by the Debtor on account of Allowed Claims that are not returned as undeliverable, but are not negotiated within sixty (60) days from and after the date of issuance thereof shall be null and void. Any holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a distribution within ninety (90) days from and after the date (a) such distribution is returned as undeliverable, or (b) of the issuance of a check that has not been returned as undeliverable, but is null and void because it was not timely negotiated, shall have such holder's claim for such distribution discharged and shall be forever barred from asserting any such claim against the estate, the Debtor or its assets.   In the event that there is more than one distribution under the Plan, any creditor whose funds escheat shall be eliminated from any future distributions. Any entities ultimately receiving undeliverable cash, voided checks or unclaimed distributions shall not be entitled to interest or other accruals of any kind. Nothing contained in the Plan shall require the Debtor to attempt to locate any holder of an Allowed Claim or an Allowed Interest.   Any undeliverable and unclaimed distributions and distributions not made shall be the Debtor's property.

## 17.    Best Interest of Unsecured Creditors.

Notwithstanding acceptance of the Plan by creditors, in order to confirm the Plan, the Bankruptcy Court must also independently determine that the Plan is in the best interests of all classes of creditors. The "best interest test" requires that the Bankruptcy Court find that the Plan provides to each member of an impaired class of Claims and interests a recovery which has a present value which is at least equal to the present value of the distribution which each such member would receive from the Debtor if the Debtor's assets were liquidated under Chapter 7 of the Bankruptcy Code.

THE DEBTOR BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CREDITORS.

After considering the effect that a Chapter 7 liquidation would have on the value of the Debtor's assets, including the costs of a Chapter 7 liquidation, the adverse effect of a forced sale on the prices which could be realized for the Debtor's assets, THE DEBTOR BELIEVES THAT ALL IMPAIRED CLASSES OF CLAIMS WOULD NOT RECEIVE ANY GREATER DISTRIBUTION IN A CHAPTER 7 LIQUIDATION AND, ACCORDINGLY, THAT SUCH CLASSES WILL RECEIVE DISTRIBUTION UNDER THE PLAN WHICH HAS A SIGNIFICANTLY GREATER PRESENT VALUE THAN THAT WHICH SUCH CLASSES WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION OF THE DEBTOR.

**18.    Feasibility.**

As a condition to confirmation of the Plan, the Bankruptcy Code requires that the Bankruptcy Court find that confirmation is not likely to be followed by liquidation of the debtor's assets or the need for further financial reorganization.   The Bankruptcy Court also must find that the Debtor proposed the Plan in good faith and that the Plan and its provisions comply with all applicable §§ of the Bankruptcy Code.  The Debtor believes, based on his projections, the Plan is feasible and will not be followed by liquidation or further restructuring. The Debtor has proposed his Plan in good faith and believes that the Plan complies with all applicable sections of the Bankruptcy Code.

**19.    Manner of Voting on Plan.**

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the Ballot for Accepting or Rejecting Plan (the "Ballot") accompanying this Disclosure Statement and filing it with the Bankruptcy Court. The Ballot may be filed in person or by mailing the Ballet to the Clerk of the Bankruptcy Court, 7th Floor, 219 S. Dearborn, Chicago Illinois 60604.  In order to be counted, all Ballots must be filed or received by the Clerk of the Bankruptcy Court on or before _____, 2013.

**20.    Considerations Relevant to the Adoption of the Plan by the Debtor.**

In deciding to adopt the Plan to present to the Debtor's creditors, the Debtor considered, among other things, the Debtor's present financial condition, the probable impact of the Plan on all interested parties and the availability, or lack thereof, of a viable alternative to the Plan.

**21.    Consequences of Plan.**

The Debtor has not obtained a tax opinion and expresses no opinion as to the tax consequences to the holder of any claim caused by the terms of the Plan. The Debtor advises and encourages all creditors and other interested parties in interest to obtain their own tax counsel to determine the tax consequences of this Plan.

BECAUSE THE DEBTOR EXPRESSES NO TAX OR LEGAL ADVICE, IN NO EVENT WILL THE DEBTOR, HIS AGENTS OR ANY PROFESSIONAL ADVISOR OR ADVISORS ENGAGED BY ANY OF THEM BE LIABLE, IF FOR ANY REASON, THE TAX OR LEGAL CONSEQUENCES OF THE PLAN ARE OTHER THAN AS ANTICIPATED. CREDITORS AND INTEREST HOLDERS MUST LOOK SOLELY  TO AND  RELY  SOLELY UPON THEIR OWN ADVISORS AS TO THE TAX AND LEGAL CONSEQUENCES OF THIS PLAN.

**22.    Disbursing Agent.**

The Debtor will act as disbursing agent for all Classes receiving payments under

The cooperation of the Creditors affected by this Plan is necessary to the success of the Plan. This Plan deals fairly and equitably with all of the Creditors involved, and the Plan should be approved by the Creditors.

Respectfully submitted,
Jeffrey Facklis,
(Debtor and Debtor in Possession)

By: _____   By: _____
    One of its attorneys            Jeffrey D. Facklis

Andrew J. Maxwell (ARDC #1799150)
Maxwell Law Group, LLC
105 W. Adams, Suite 3200
Chicago, Illinois 60603
312/368-1138